ORAL ARGUMENT NOT YET SCHEDULED

Case Nos. 13-1174 (L); 13-1183 (consolidated)

IN THE

*United States Court of Appeals*

FOR THE DISTRICT OF COLUMBIA CIRCUIT

MUSIC CHOICE,
*Appellant,*

—v.—

COPYRIGHT ROYALTY BOARD,
*Appellee,*

SOUNDEXCHANGE, INC., and,
SIRIUS XM RADIO, INC.,
*Intervenors.*

ON APPEAL FROM A FINAL DETERMINATION OF THE COPYRIGHT
ROYALTY BOARD

**OPENING BRIEF FOR APPELLANT
MUSIC CHOICE**

Paul M. Fakler, Esq.
ARENT FOX LLP
1675 Broadway
New York, NY 10019
(212) 457-5445
paul.fakler@arentfox.com

Martin F. Cunniff
ARENT FOX LLP
1717 K Street, N.W.
Washington, D.C. 20036
(202) 857-6000
martin.cunniff@arentfox.com

*Attorneys for Appellant Music Choice*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rules 26.1 and 28(a)(1) and Federal Rules of Appellate Procedure 26.1 and 28(a)(1), Appellant Music Choice submits this Certificate and Statement:

## (A) Parties and Amici

Music Choice, Sirius XM Radio Inc. ("Sirius XM") and SoundExchange, Inc. ("SoundExchange") participated in the proceeding before the Copyright Royalty Board that is the subject of this consolidated appeal.

Music Choice is a general partnership, which provides digital music programming as a "preexisting subscription service" as that term is defined in Section 114(j)(11) of the Copyright Act. Music Choice does not have a corporate parent. The following publicly-held companies hold a 10% or greater interest in Music Choice, through various of their wholly-owned subsidiaries: Comcast Corporation, Sony Corporation of America, Time Warner Inc., and ARRIS Group, Inc..

Music Choice is the Appellant in *Music Choice v. Copyright Royalty Board*, Case No. 13-1774. The Copyright Royalty Board is the

i

Appellee in that appeal, and both SoundExchange and Sirius XM are Intervenors.

SoundExchange is the Petitioner in the related appeal of *SoundExchange v. Copyright Royalty Board*, Case No. 13-1183, which has been consolidated with Case No. 13-1774.  The Copyright Royalty Board is the Respondent in that appeal, and both Music Choice and Sirius XM are Intervernors.


(B) Rulings Under Review

This appeal seeks review of the *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, Docket No. 2011-1 CRB PSS/Satellite II, issued by the Copyright Royalty Board on February 14, 2013 and published in the Federal Register at 78 FR 23054 on April 17, 2013, as modified by the Copyright Royalty Board on April 30, 2013 and published in the Federal Register at 78 FR 31842 on May 28, 2013 (the "Final Determination").


(C) Related Cases

The case on appeal has not previously been before this Court or

any other court.  This appeal has been consolidated with a related appeal, *SoundExchange v. Copyright Royalty Board*, Case No. 13-1183, which is also an appeal of the Final Determination.  Music Choice is not aware of any other related cases.


Dated:  January 14, 2014          Respectfully submitted,

   /s/ Paul M. Fakler

Paul M. Fakler
ARENT FOX LLP
1675 Broadway
New York, NY 10019-5874
Tel: 212.484.3900
Fax: 212.484.3990
paul.fakler@arentfox.com

Martin F. Cunniff
ARENT FOX LLP
1717 K Street, N.W.
Washington, D.C.  20036
Tel: 202.857.6000
Fax: 202.857.6395
martin.cunniff@arentfox.com

*Attorneys for Appellant Music Choice*

iii

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND CORPORATE DISCLOSURE STATEMENT....... ................................................................i

TABLE OF AUTHORITIES ......................................................vii

GLOSSARY OF ABBREVIATIONS AND ACRONYMS ....................... x

JURISDICTIONAL STATEMENT ........................................... 1

PERTINENT STATUTES AND REGULATIONS ................................ 1

STATEMENT OF ISSUES PRESENTED ...................................... 2

STATEMENT OF THE CASE ................................................ 3

    A.    Statutory History of the Sound Recording Performance Right ..............3

        1.    For Almost the Entire First Century of the Recording Industry's Existence, Sound Recordings Were Excluded From the Copyright Act ........................................................3

        2.    Congress's First Grant of a Limited Copyright for Sound Recordings ..................................................................3

        3.    Congress's Creation of a Limited, Digital Performance Right .....................................................................5

    B.    Statutory History of the PSS License ...................................6

        1.    Congress's Creation of a Compulsory License for Non-Interactive Subscription Services and Selection of a Policy Based Rate-Setting Standard ........................................6

        2.    Congress's Changes to the Section 114 License in the 1998 DMCA and Decision to Continue Use of the Policy Based Rate Standard for the PSS ................................................8

    C.    Regulatory History of the PSS Rate ...................................10

        1.    The 1996 CARP Proceeding and Subsequent Appeals ...........10

        2.    Subsequent Settlement Agreements........................................11

SUMMARY OF ARGUMENT ............................................... 12

STANDING.............................................................. 17

ARGUMENT .............................................................. 18

# TABLE OF CONTENTS
(continued)

**Page**

I. STANDARD OF REVIEW ................................................................. 18

II. THE CRB'S REJECTION OF THE MUSICAL COMPOSITION
PERFORMANCE BENCHMARK WAS CONTRARY TO
PRECEDENT AND UNSUPPORTED BY RECORD
EVIDENCE ................................................................................. 18

    A.   The Judges' Rejection of the Benchmark Previously Used to Set
the PSS Rate Violated Section 803(a)(1) of the Copyright Act ........... 18

    B.   The Judges' Rejection of the PRO Rate Benchmark Was Not
Supported by Record Evidence ........................................................... 22

    C.   The Judges Should Have Used the PRO Rate Benchmark to Set
the Upper Boundary of Reasonable PSS Rates. ................................... 26

III. THE CRB'S USE OF THE PRIOR PSS RATE AS THE
BENCHMARK TO SET THE PSS RATE WAS ARBITRARY
AND UNSUPPORTED BY RECORD EVIDENCE ...................... 32

    A.   The PSS Settlement Rate Was Derived From a Gross
Overestimate of the PRO Rate Benchmark in PSS-I ........................... 35

    B.   The Rate Increases Included in the PSS Settlement Rate Were
Driven Solely by the Disparate Impact of Rate Litigation Costs
on a Small Company Like Music Choice ............................................. 36

IV. THE CRB'S *SUA SPONTE* IMPOSITION OF A RATE
INCREASE BASED SOLELY UPON MUSIC CHOICE'S
PLANNED FUTURE CHANNEL EXPANSION, WITHOUT
ANY EVIDENCE CONCERNING THE IMPACT, IF ANY,
SUCH EXPANSION WOULD HAVE ON SUBSCRIBER
LISTENING OR REVENUES, WAS ARBITRARY AND
UNSUPPORTED BY RECORD EVIDENCE ................................ 38

    A.   The Judges Acknowledged the Lack of Evidence Supporting
Their Assumption That Listening Would Increase, Yet
Inexplicably Imposed a Rate Increase Based Upon That
Assumption ......................................................................................... 39

# <u>TABLE OF CONTENTS</u>
### (continued)

**Page**

B.  Even If There Had Been Evidence Indicating That a Channel Expansion Would Lead to An Accurately Estimable Future Increase in Listening, Such Increased Listening Could Not Justify the Judges' Rate Increase .................................................................41

V. THE CRB'S INTERPRETATION OF THE SECTION 801(B)(1) RATE STANDARD WAS LEGALLY ERRONEOUS AND ITS APPLICATION OF THAT STANDARD WAS ARBITRARY, CONTRARY TO PRECEDENT, AND UNSUPPORTED BY RECORD EVIDENCE................................ 43

A.  The Section 801(b)(1) Policy Standard .................................................43

B.  The CRB's Interpretation of the First Section 801(b)(1) Objective Was Legally Erroneous ..........................................................44

C.  The CRB's Interpretation of the Second Section 801(b)(1) Objective Was Legally Erroneous and Its Application of That Factor Was Unsupported by Record Evidence ....................................46

D.  The CRB's Interpretation of the Third Section 801(b)(1) Objective Was Legally Erroneous ........................................................48

E.  The CRB's Interpretation of the Fourth Section 801(b)(1) Objective Was Legally Erroneous and Its Application of That Factor Was Unsupported by Record Evidence ....................................49

  1.  The Judges Erroneously Interpreted the Fourth Objective, Minimizing Any Disruptive Impact On the Industries Involved, as Being Satisfied by Any Rate That Does Not Directly Produce an Adverse Impact That Is Substantial, Immediate, and Irreversible in the Short Run ...........................49

  2.  The Judges' Finding That the PSS Settlement Rate Would Not Cause Any Disruption to the PSS Was Unsupported by Record Evidence ...........................................52

CONCLUSION .............................................................................54

# TABLE OF AUTHORITIES[*]

**Page(s)**

CASES

*Christian Broadcasting Network v. CRT,*
    720 F.2d 1295 (D.C. Cir. 1983) ............................................................ 32

*F.C.C. v. Fox Tel. Stations, Inc.,*
    556 U.S. 502 (1983) ............................................................................. 21

*\*Intercollegiate Broadcast System, Inc. v. CRB,*574 F.3d 748 (D.C.
    Cir. 2009) .................................................................. 18, 32, 33, 39, 41

*LeMoyne-Owen Coll. v. N.L.R.B.,*
    357 F.3d 55 (D.C. Cir. 2004) .............................................................. 21

*Ramaprakash v. F.A.A.,*
    346 F.3d 1121 (D.C. Cir. 2003) .......................................................... 21

*\*Recording Indus. Ass'n of Am. v. Librarian of Cong.,*
    176 F.3d 528 (D.C. Cir. 1999) ..................................................... 10, 20

RULES

D.C. Cir. R. 28(a)(5) ................................................................................ 1

STATUTES AND REGULATIONS

5 U.S.C. § 706(2) ................................................................................... 18

17 U.S.C. § 112.................................................................................... 43

17 U.S.C. § 114.............................................................................. 1, 7, 43

*\*17 U.S.C. § 801 1, 2, 8, 9, 12, 13, 15, 35, 36, 43, 44, 46, 48, 49, 50, 51, 54

*\*17 U.S.C. § 803.............................................. 1, 17, 18, 19, 26, 32, 49

---

[*] Authorities upon which Music Choice chiefly relies are marked with asterisks.

vii

# TABLE OF AUTHORITIES

(continued)

Digital Millenium Copyright Act, Pub. L. No. 105-304, 112 Stat.
2860 (1998) ............................................................................................ 8

Digital Performance Recording Act, Pub. L. No. 104-39, 109 Stat.
336 (1995) .............................................................................. 5, 7, 8, 9

Sound Recording Act of 1971, Pub. L. No. 92-140,
85 Stat. 391 (1971) ................................................................................ 4

## LEGISLATIVE MATERIALS

Conference Report of the committee of conference on the
disagreeing votes of the two Houses on the DMCA, H. Rep. No.
105-796 (1998) ............................................................................ 8, 9, 51

*Report of the House Judiciary Committee on the proposed DPRA,
H. Rep. No. 104-274 (1995) ........................................................ 6, 7, 50

*Report of the Senate Judiciary Committee on the proposed
DPRA, S. Rep. No. 104-128 (1995) ......................... 5, 6, 7, 44, 46, 50

## OTHER AUTHORITIES

Barbara A. Ringer, Copyright Law Revision, Study No. 26: *The
Unauthorized Duplication of Sound Recordings*, 86th Cong.,
2nd Sess. (Feb. 1957) ............................................................................ 4

*Determination of Rates and Terms for Preexisting Subscription
Services and Satellite Digital Audio Radio Services*, Docket No.
2006-1 CRB DSTRA (*SDARS*-I) 73 FR 4080 (Jan. 24, 2008) ....... 24, 25

*\*Determination of Reasonable Rates and Terms for the Digitial
Performance of Sound Recordings and Emphemeral Recordings*,
Docket No. 2000-9 CARP DTRA 1&2 (*Webcasting-I*) 67 FR
45240 (July 8, 2002) .............................................................. 20, 24, 26

*Federal Copyright Protection for Pre-1972 Sound Recordings*,
www.copyright.gov/docs/sound/pre-72-report.pdf (Dec. 2011) ............. 3

# TABLE OF AUTHORITIES

(continued)

\*_Final Determination of the Librarian in PSS-I_, Docket No. 96-5
    CARP DSTRA (_Librarian's PSS Determination_) 63 FR 25394
    (May 8, 1998).................... 19, 22, 26, 27, 28, 44, 46, 48, 49, 50, 51, 52

_In re: Determination of Rates and Terms for the Digital
    Performance of Sound Recordings,_ Docket No. 96-5 CARP
    DSTRA (_CARP PSS Report_) ............................................... 35

_In re: Digital Performance Right in Sound Recordings and
    Ephemeral Recordings_, Docket No. 2005-1 CRB DTRA
    (_Webcasting-II_) 72 FR 24084 (May 1, 2007)........................................ 24

\*_Opinion of the Register on a certified question from the Judges_,
    Docket Nos. RF 2006-2 and RF 2006-3, (_Register's PSS
    Opinion_) 71 FR 64639 (Nov. 23, 2006) ...................................... 8, 9, 51

_Performance Rights in Sound Recordings_, Subcommittee on
    _Courts, Civil Liberties, and the Administration of Justice_,
    House Comm. on the Judiciary, 95th cong., 2d Sess., (1978) ............ 4

# GLOSSARY OF ABBREVIATIONS AND ACRONYMS

***"APA"*** is the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.

***"ASCAP"*** is the American Society of Composers, Authors and Publishers, a performing rights organization.

***"BMI"*** is Broadcast Music, Inc., a performing rights organization.

***"Bryan WDT"*** is the Corrected Written Direct Testimony of Stephen Bryan dated March 21, 2012, and submitted as SX Trial Exhibit 66 in the proceeding below.

***"CARP"*** is the Copyright Arbitration Royalty Panel.

***"CARP PSS Report"*** is the Report of the CARP dated November 12, 1997 in In re: Determination of Statutory License Terms and Rates for Certain Digital Subscription Transmissions of Sound Recordings, Docket No. 96-5 CARP DSTRA.

***"CRB"*** is the Copyright Royalty Board.

***"CRT"*** is the Copyright Royalty Tribunal

***"Crawford WRT"*** is the Amended And Corrected Written Rebuttal Testimony of Gregory S. Crawford, Ph.D. dated August 2, 2012, admitted as PSS Trial Exhibit 42 in the proceeding below.

***"Del Beccaro Uncorrected WDT"*** is the Written Direct Testimony of David J. Del Beccaro dated November 28, 2011.

***"Del Beccaro WDT"*** is the Corrected Written Direct Testimony of David J. Del Beccaro dated May 9, 2012, admitted as PSS Trial Exhibit 1 in the proceeding below.

***"Del Beccaro WRT"*** is the Corrected Written Rebuttal Testimony of David J. Del Beccaro dated August 2, 2012, admitted as PSS Trial Exhibit 21 in the proceeding below.

**"DMCA"** is the Digital Millenium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (1998).

**"DMCA Conference Report"** is the Conference Report of the committee of conference on the disagreeing votes of the two Houses on the DMCA, H. Rep. No. 105-796 (1998).

**"DPRA"** is the Digital Performance Recording Act, Pub. L. No. 104-39, 109 Stat. 336 (1995).

**"DPRA House Report"** is the Report of the House Judiciary Committee on the proposed DPRA, H. Rep. No. 104-274 (1995).

**"DPRA Senate Report"** is the Report of the Senate Judiciary Committee on the proposed DPRA, S. Rep. No. 104-128 (1995).

**"Final Determination"** is the Final Determination of the Copyright Royalty Judges in the proceeding below, published in the Federal Register on April 17, 2013 at 78 FR 23054 and as modified by technical correction, published in the Federal Register on May 28, 2013 at 78 FR 31842.

**"Ford WDT"** is the Second Corrected Written Direct Testimony of Dr. George S. Ford dated August 13, 2012, admitted in part as SX Trial Exhibit 244.

**"Harrison WRT"** is the Written Rebuttal Testimony of Aaron Harrison, dated August 20, 2012, admitted as PSS Trial Exhibit 32.

**"Judges"** are the Copyright Royalty Judges.

**"Librarian"** is the Librarian of Congress.

**"Librarian's PSS Determination**," is the Final Determination of the Librarian in PSS-I, published in the Federal Register on May 8, 1998 at 63 FR 25394.

**"PROs"** are performing rights organizations.

**"PSS"** are the Preexisting Subscription Services as that term is defined in Title 17 USC § 114(j)(11).

**"PSS-I"** is the CARP proceeding captioned In re: Determination of Rates and Terms for the Digital Performance of Sound Recordings, Docket No. 96-5 CARP DSTRA.

**"PSS Settlement Rate"** is the 7.5% rate agreed to by Music Choice and SoundExchange as part of a settlement for the prior rate period.

**"PRO Rate"** is the sum of the royalty rates paid by Music Choice to the PROs.

**"Register"** is the Register of Copyrights.

**"Register's Report"** is the Report of the Register of Copyrights, Federal Protection for Pre-1972 Sound Recordings, December 2011, available at www.copyright.gov/docs/sound/pre-72-report.pdf.

**"Register's PSS Opinion"** is the opinion of the Register on a certified question from the Judges in Docket Nos. RF 2006-2 and RF 2006-3 published in the Federal Register on November 23, 2006 at 71 FR 64639.

**"RIAA"** is the Recording Industry Association of America.

**"SDARS-I"** is the CRB's Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services published in the Federal Register on January 24, 2008 at 73 FR 4080.

**"SDARS-I Proceeding"** is the proceeding before the CRB titled In re: Determination of Rates and Terms for Preexisting Services and Satellite Digital Audio Radio Services, Docket No. 2006-1 CRB DSTRA.

**"SESAC"** is SESAC, Inc., a performing rights organization.

**"SoundExchange"** is SoundExchange, Inc., the organization

designated to collect and distribute royalties related to the Section 114 statutory license.

*"SRA"* is the Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 (1971).

*"Tr."* is the transcript of the hearing before the Judges in the proceeding below.

*"Webcasting-I"* is the CARP's Determination of Reasonable Rates and Terms for the Digitial Performance of Sound Recordings and Emphemeral Recordings published in the Federal Register at 67 FR 45240 on July 8, 2002.

*"Webcasting-I Proceeding"* is the proceeding before the CARP titled Determination of Reasonable Rates and Terms for the Digitial Performance of Sound Recordings and Emphemeral Recordings, Docket No. 2000-9 CARP DTRA 1&2.

*"Webcasting-II"* is the CRB's final determination in In re: Digital Performance Right in Sound Recordings and Ephemeral Recordings, Docket No. 2005-1 CRB-DTRA, published in the Federal Register on May 1, 2007 at 72 FR 24084.

## JURISDICTIONAL STATEMENT

The CRB had jurisdiction over the proceeding below under 17 U.S.C. §§ 114(f)(1)(A) and 801(b)(1).  This Court has jurisdiction over Music Choice's appeal of the Final Determination under 17 U.S.C. § 803(d)(1).  Music Choice has standing to bring this appeal because it participated fully in the proceeding below and filed its Notice of Appeal within 30 days after publication of the Final Determination in the Federal Register.  17 U.S.C. § 803(d)(1).

## PERTINENT STATUTES AND REGULATIONS

Pursuant to D.C. Cir. Rule 28(a)(5), the pertinent statutes and regulations are set forth in the addendum to this brief.

1

## STATEMENT OF ISSUES PRESENTED

1.    Whether the CRB's rejection of Music Choice's proposed PRO Rate benchmark was arbitrary, capricious, an improper departure from applicable precedent, an abuse of discretion, legally erroneous, or unsupported by substantial record evidence.

2.    Whether the CRB's use of the PSS Settlement Rate as the benchmark to derive the PSS rate for the new rate period was arbitrary, capricious, an improper departure from applicable precedent, an abuse of discretion, legally erroneous, or unsupported by substantial record evidence.

3.    Whether the CRB's issuance of a rate increase based solely upon a planned future channel expansion by Music Choice was arbitrary, capricious, an abuse of discretion, legally erroneous, or unsupported by substantial record evidence.

4.    Whether the CRB's interpretation and application of the Section 801(b) policy factors was arbitrary, capricious, an improper departure from applicable precedent, an abuse of discretion, legally erroneous, or unsupported by substantial record evidence.

## STATEMENT OF THE CASE

### A.    Statutory History of the Sound Recording Performance Right

1.    For Almost the Entire First Century of the Recording Industry's Existence, Sound Recordings Were Excluded From the Copyright Act

The sound recording industry can trace its history back to the invention of the phonograph in 1877 and the founding of the first record company, Columbia, in 1888.  Although the recording industry repeatedly lobbied Congress to extend copyright protection to sound recordings, Congress consistently resisted these entreaties.  As a consequence, the musical compositions (the melodies and lyrics comprising the songs) embodied in sound recordings were covered by the Copyright Act, but the sound recordings themselves were not.  *See Register's Report,* available at www.copyright.gov/docs/sound/pre-72-report.pdf, at 7-10.  It was during this long historical period and in this legal landscape that both the recording and radio industries developed and thrived.

2.    Congress's First Grant of a Limited Copyright for Sound Recordings

It was not until November 15, 1971, almost one hundred years

3

after the invention of the phonograph, that Congress extended federal copyright protection to sound recordings with the passage of the SRA. SRA, Pub. L. No. 92-140, § 3, 85 Stat. 391, 392 (1971).  Even then, sound recordings were granted only a limited copyright, excluding any public performance right.

Congress declined to provide a public performance right for sound recordings in part because its focus was on combating piracy, but also because of concerns about disruption of the radio broadcasting industry, which had never been required to pay sound recording royalties before. Barbara A. Ringer, Copyright Law Revision, Study No. 26: *The Unauthorized Duplication of Sound Recordings*, at 37 (Feb. 1957); *Performance Rights in Sound Recordings*, *Subcommittee on Courts, Civil Liberties, and the Administration of Justice*, House Comm. on the Judiciary, 95th cong., 2d Sess., at 54-55 (1978) (comm. Print No. 15). Thus, even after the creation of a limited federal copyright for sound recordings, both the recording and radio industries continued to develop and thrive without radio broadcasters paying any royalties to sound recording copyright owners.

4

3.     Congress's Creation of a Limited, Digital Performance Right

The legal landscape changed once more with the passage of the DPRA. Responding again to record industry concerns regarding the displacement of record sales, this time from then-nascent technology that would allow interactive, or on-demand, digital performances of sound recordings, which could substitute for the purchase of physical records, Congress granted a limited public performance right for sound recordings.

Because this expansion of rights was again driven by concerns over threats to record sales, and also because Congress continued to recognize the promotional value of radio airplay to those record sales, the new performance right was limited in several ways, including by limiting the scope of the exclusive right to digital performances. DPRA Senate Report at 13 ("[T]he Committee has sought to address the concerns of record producers and performers regarding the effects that new digital technology and distribution systems might have on their core business without upsetting the longstanding business and contractual relationships among record producers and performers, music composers and publishers and broadcasters that have served all

5

of these industries for decades.").

Another fundamental way in which Congress limited the new digital performance right for sound recordings was by making that right subject to a compulsory license for those digital music services unlikely to pose any harm to record sales.

## B.  **Statutory History of the PSS License**

### 1.  Congress's Creation of a Compulsory License for Non-Interactive Subscription Services and Selection of a Policy Based Rate-Setting Standard

In enacting the DPRA, Congress credited the record industry's claim that interactive, on-demand music services were likely to be highly substitutional for the sale of legitimate copies of sound recordings. DPRA House Report at 14; DPRA Senate Report at 16. Nonetheless, the DPRA was meant to balance the protection of the recording industry's core business (the distribution and sale of recordings) with the public's interest in fostering new technologies for the enjoyment of music.  DPRA Senate Report at 15; DPRA House Report at 14.

Thus, Congress limited the exclusive digital performance right by

creating a compulsory license in Section 114 of the Copyright Act for non-interactive subscription music services so that copyright owners could not refuse to license these services, while excluding interactive services from the scope of the license. DPRA, § 3, 109 Stat. 336, 338, 340-42 (1995).

When Congress passed the DPRA, a small number of digital, non-interactive subscription services were already operating, including Music Choice, which had been in business for several years without any statutory obligation to pay royalties to sound recording copyright owners. Del Beccaro WDT at 1; 6/11/12 Tr. 1453:9-12. The DPRA changed the rules for these businesses. Thus, while creating an entirely new revenue stream for the recording industry at the expense of these businesses, one of the specific reasons cited by Congress for creating the compulsory license was to ensure that it would remain economically feasible for those few existing music services to continue their uses of sound recordings. DPRA Senate Report at 16; DPRA House Report at 14.

Further to this legislative purpose, Congress provided that the rates for the Section 114 license would be set, in the absence of industry

agreement, using the multi-factor policy based standard set out in

Section 801(b)(1) of the Copyright Act.  DPRA § 3, 109 Stat. at 340-41.

> 2. Congress's Changes to the Section 114 License in the 1998
>    DMCA and Decision to Continue Use of the Policy Based
>    Rate Standard for the PSS

In 1998, Congress again modified the legal landscape in which

digital music services operate, in response to the record industry's

concerns that the DPRA and Section 114 license had not expressly

addressed certain non-subscription digital music services, i.e.,

webcasters.  DMCA, Pub. L. No. 105-304, § 405(a), 112 Stat. 2860, 2890

(1998); DMCA Conference Report at 80.

With the passage of the DMCA, Congress changed the rate-setting

standard for future services eligible for the Section 114 license to a

willing buyer – willing seller standard.  DMCA, § 405(a), 112 Stat. at

2896.  *See also Register's PSS Opinion*, 71 FR at 64641.  At the same

time, however, Congress "grandfathered" the three PSS, Music Choice,

DMX and Muzak, that were already in operation at the time the DMCA

was passed, allowing the PSS to keep the 801(b) policy-based rate

standard rather than subjecting them to the new marketplace standard.

DMCA, § 405(a), 112 Stat. 2894-95; *Register's PSS Opinion*, 71 FR at

8

64641.

Similar to its purpose in the DPRA, Congress continued to apply the Section 801(b) policy standard to the PSS in recognition of the PSS' legitimate business expectancies as pioneers who launched the very first digital music services under a different legal and licensing landscape than those that would enter the market in the future. DMCA Conference Report at 81; *Register's PSS Opinion* at 64641. Indeed, the legislative history of the DMCA expressly states that the reason for continuing to apply the policy-based standard of Section 801(b) to the PSS was "to prevent disruption of existing operations by such services." DMCA Conference Report at 81.

In deciding a novel question of law referred to her by the Judges in the last PSS proceeding, the Register (agreeing with arguments made by SoundExchange) further amplified this legislative history, explaining that Congress "understood that the entities so designated as preexisting had invested a great deal of resources into developing their services under the terms established in 1995 as part of the [DPRA], and that those services deserved to develop their businesses accordingly." *Register's PSS Opinion*, 71 FR at 64645. As also noted by the Register,

9

"[g]randfathering provisions are frequently included in statutes to ensure continuity and to reward the investment and efforts of those [such as the PSS] who were the first to take on the struggles and risks of novel enterprises or methods."  *Id*. at 64646.

### C.    Regulatory History of the PSS Rate

1.    The 1996 CARP Proceeding and Subsequent Appeals

During PSS-I, commenced in 1996, the CARP initially set the royalty rate at 5% of gross domestic revenue from each licensed residential service. Del Beccaro WDT at 6.

On appeal, in 1998, the Librarian adopted the proposal of the Register and changed the rate to 6.5%.  That rate, as well as the method used to arrive at the rate, were affirmed on appeal by this Court.  *Recording Indus. Ass'n of Am. v. Librarian of Cong.*, 176 F.3d 528, 533-35 (D.C. Cir. 1999) ("*RIAA v. Librarian*").

To arrive at a benchmark for the PSS rate, the Librarian used the sum of the services' license rates for the digital performance of the underlying musical compositions paid to ASCAP, BMI and SESAC. He used this PRO Rate to establish the highest possible reasonable rate for the equivalent digital sound recording

10

performance license. Del Beccaro WDT at 9.

The Librarian relied upon the CARP's estimate of 10% of revenues as the maximum likely PRO Rate.  Next, the Register considered the evidence relevant to the policy objectives contained in the statute, and used those considerations to set the reasonable royalty rate at 6.5%, or 65% of the PRO Rate.  Del Beccaro WDT at 9-10.

2.    Subsequent Settlement Agreements

Subsequent to PSS-I, each time successive rate periods began, Music Choice settled with SoundExchange. The undisputed evidence establishes that Music Choice settled, and agreed to slight rate increases, solely to avoid the prohibitive costs associated with the rate-setting process and not because the settled upon rate reflected any of the statutory policy objectives or had any relationship to the fair market value of the license.  Del Beccaro WDT at 6-7.

## SUMMARY OF ARGUMENT

As the first digital music service ever launched, Music Choice participated in the very first Section 114 rate proceeding, PSS-I. In that proceeding the rate was ultimately set by the Librarian (on appeal from the CARP), who used an estimated PRO Rate benchmark to set the upper bound of the range of reasonable rates. He then analyzed various evidence submitted by the parties related to the four Section 801(b) policy objectives and set the initial PSS rate substantially lower than the PRO Rate. The Librarian's determination was affirmed by this Court. The PSS rate has not been set by a CARP or CRB proceeding since that time, until the proceeding below.

In this proceeding, Music Choice followed the clear roadmap set forth in the *Librarian's PSS Determination*. Like the Librarian, Music Choice started with the PRO Rate benchmark, demonstrating that the estimate of that rate used by the CARP and Librarian (at a time when the PSS only had interim PRO licenses) was much higher than the actual rates ultimately negotiated by the PSS. As a result, the correct upper bound of the range of reasonable rates is significantly lower than that considered by the Librarian. Next, Music Choice submitted the

12

very same kinds of evidence relied upon by the Librarian to evaluate the four policy objectives of Section 801(b)(1), and demonstrated that the PSS rate should again be set significantly below the PRO Rate benchmark in furtherance of those objectives.

In the *Final Determination*, the Judges completely abandoned the methodology and precedent of the *Librarian's PSS Determination*, reaching diametrically opposite conclusions based upon essentially the same evidentiary record as that considered by the Librarian.  The Judges first erred by rejecting the previously-used PRO Rate benchmark, even though they acknowledged that there was no other usable marketplace benchmark in evidence.  The Judges erroneously rejected Music Choice's substantial evidence that in various international rate-setting tribunals the sound recording and musical composition performance license rates have consistently been treated as equivalent.  Moreover, the Judges cited no record evidence that would justify their departure from the Librarian's precedential ruling that the PRO Rate was a usable benchmark (particularly in the absence of any better benchmark).

The Judges also erred by using the PSS Settlement Rate, instead

13

of the PRO Rate, as the benchmark to set the PSS Rate. As a preliminary matter, the Judges acknowledged that the PSS Settlement Rate was not a proper marketplace benchmark yet inexplicably used it anyway. Moreover, the undisputed evidence demonstrated that the PSS Settlement Rate (1) was itself based upon the inaccurate overestimate of the PRO Rate used by the Librarian and (2) included multiple rate increases agreed to by Music Choice solely to avoid the massive expense of rate litigation. Indeed, neither Music Choice nor SoundExchange ever argued that the PSS Settlement Rate was a usable benchmark.

The Judges compounded these errors by implementing a rate increase based solely upon Music Choice's future plans to expand the number of channels offered to its subscribers, even though the Judges admitted that there was no evidence establishing what (if any) effect the additional channels would have on subscribers' usage of the service or Music Choice's revenues. This rate increase was not proposed at any time during the proceeding. The argument was raised, *sua sponte*, for the first time in the *Final Determination*. Moreover, the Judges assumed that there would likely be some increase in revenue associated

14

with the additional channels.  Any such increased revenues would have yielded increased royalty payments under the existing rate, because that rate is calculated as a percentage of revenue.  Thus, even if there had been evidence in the record supporting the assumed future increase in usage, it would not have supported an increase in the PSS rate.

The Judges additionally erred in their interpretation and application of the individual Section 801(b)(1) policy objectives.  With respect to the first factor, maximizing the availability of creative works, the Judges erred by interpreting this factor as satisfied by any rate that does not cause the PSS to limit their services or exit the market.

In addressing the second objective, fair return to copyright owners and fair income to users, the Judges erred by rejecting Music Choice's evidence demonstrating that the existing rates have prevented Music Choice from generating any cumulative return on its investments and instead basing its findings of profitability on Music Choice's consolidated financial statements, which included revenues from an unrelated (and more profitable) business line, for which Music Choice pays a separate (and higher) royalty rate.

15

With respect to the third objective, the parties' relative contributions related to the licensed service, Music Choice submitted the same types of evidence credited by the Librarian in PSS-I as warranting a lower rate, but demonstrating substantially higher contributions by Music Choice. Presented with such evidence, the Judges erroneously came to the opposite conclusion from the Librarian, namely that these contributions did not warrant a lower rate.

Finally, with respect to the fourth objective, avoiding market disruption, the Judges erroneously interpreted this objective as being satisfied by any rate that does not "directly produce an adverse impact that is substantial, immediate, and irreversible in the short-run." This narrow focus on immediate and irreversible impacts is inconsistent with precedent and the legislative purpose of the PSS license. Moreover, the Judges' finding that the PSS market has not been disrupted by existing rates is unsupported by record evidence. The undisputed evidence demonstrates that under the existing PSS rate, Music Choice has yet to generate a cumulative return on its partners' investments in the service, and the other two PSS have effectively abandoned the market.

16

## **STANDING**

Music Choice has standing to bring this appeal because it participated fully in the proceeding below and filed its Notice of Appeal within 30 days after publication of the Final Determination in the Federal Register.  17 U.S.C. § 803(d)(1).

# ARGUMENT

## I.
## STANDARD OF REVIEW

This Court reviews determinations of the Judges under the standard of the APA, which provides that the Court must modify or vacate the determination on appeal to the extent the determination is arbitrary, capricious, contrary to law, or not supported by substantial evidence. 17 U.S.C. § 803(d)(3); 5 U.S.C. § 706(2); *Intercollegiate Broadcast System, Inc. v. CRB*, 574 F.3d 748, 755 (D.C. Cir. 2009) ("*IBS v. CRB"*).

## II.
## THE CRB'S REJECTION OF THE MUSICAL COMPOSITION PERFORMANCE BENCHMARK WAS CONTRARY TO PRECEDENT AND UNSUPPORTED BY RECORD EVIDENCE

### A.  The Judges' Rejection of the Benchmark Previously Used to Set the PSS Rate Violated Section 803(a)(1) of the Copyright Act

Section 803(a)(1) of the Copyright Act requires that in all proceedings before the Judges, they must act on the basis of the written record and must follow various specifically enumerated precedent, including prior determinations and interpretations of the Librarian. 17 U.S.C. § 803(a)(1). By rejecting Music Choice's proffered PRO Rate

18

benchmark, which was used by the Librarian as the original benchmark to set the upper bound of reasonable royalty rates for the PSS, without pointing to any changes in facts or different evidence not considered by the Librarian in PSS-I justifying their departure from precedent, the Judges failed to follow applicable precedent as required by Section 803(a)(1).

As a preliminary matter, the Judges seem to have disagreed with the premise that the Librarian actually used the PRO Rate to set the upper bound of reasonable rates, asserting that they were unable to "discern the degree to which that benchmark influenced or altered the Librarian's decision." *Final Determination*, 78 FR at 23055. This position, which the Judges used as a basis to reject the PRO Rate benchmark, constitutes a clearly erroneous legal interpretation of the *Librarian's PSS Determination*. It is clear from that *Determination* itself that the Librarian used the PRO Rate as a benchmark to set the upper bound of reasonable rates. *Librarian's PSS Determination*, 63 FR at 25405 (after adopting the PRO Rate as a benchmark, finding no basis in the record "for making an upward adjustment to the musical works performance license fees to establish a broader range of potential

19

rates"), 25409-410 (re-iterating adoption of the PRO Rate as the benchmark "because these rates represent an actual marketplace value for a public performance right in the digital arena, albeit not the digital performance right in sound recordings" and then using that benchmark to set the upper bound of reasonable rates based upon his "determination that the value of the performance right in the sound recording does not exceed the value of the performance right in the musical works."). *See also RIAA v. Librarian*, 176 F.3d at 531 (noting that the Librarian had used the PRO Rate as the primary benchmark to set the PSS rate).

Additionally, four years after he issued the *PSS Determination* the Librarian issued his *Webcasting-I* determination, in which he expressly acknowledged that he had used the PRO Rate as the benchmark to set the upper bound of reasonable rates for the PSS. *Webcasting-I*, 67 FR at 45247. Thus, the Judges erroneously interpreted the applicable precedent by concluding that the manner in which the Librarian used the PRO Rate in the *Librarian's PSS Determination* was unclear.

Driven by their erroneous interpretation of the applicable precedent, the Judges also failed to follow that precedent. Although the

20

Judges are not barred from making determinations inconsistent with precedent if those inconsistencies are justified by record evidence demonstrating changed circumstances or facts, the Judges are not free to draw a diametrically opposite conclusion from essentially the same facts.  Such agency "ad hocery" has been found impermissible by this Court.  *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1130 (D.C. Cir. 2003). "[W]here, as here, a party makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument. . . .  The need for an explanation is particularly acute when an agency is applying a multi-factor test through case-by-case adjudication."  *LeMoyne-Owen Coll. v. N.L.R.B.*, 357 F.3d 55, 61 (D.C. Cir. 2004).

This requirement that departures from precedent be specifically justified by record evidence applies not only to legal conclusions and mixed questions of fact and law, but even to fact findings.  *F.C.C. v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 537 (1983) (Kennedy, J., concurring) ("An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate.")

21

In the *Final Determination*, the Judges have come to opposite conclusions on the PRO Rate benchmark, but have given no legitimate justification for failing to follow the precedent of the *Librarian's PSS Determination*, which involved the exact same license for the exact same services during a prior rate period.

**B.**   **The Judges' Rejection of the PRO Rate Benchmark Was Not Supported by Record Evidence.**

With respect to comparability, i.e. whether the PSS PRO performance licenses are sufficiently comparable to the PSS Section 114 performance license to use the PRO Rate as a benchmark, the Librarian in PSS-I clearly determined that the PRO licenses were sufficiently comparable. *Librarian's PSS Determination*, 63 FR at 25409 (noting that the PRO Rate "represent[s] an actual marketplace value for a public performance right in the digital arena, albeit not the digital performance right in sound recordings."). The Librarian was well aware that one license covered digital performance rights in musical compositions while the other covered digital performance rights in sound recordings, and therefore the PRO Rate benchmark did not without further adjustment (downward) precisely determine the proper Section 114 rate. But the PRO Rate benchmark is identical in every

22

other relevant aspect (i.e., both are music performance rights for intermingled components of sound recordings and cover the exact same uses by the exact same buyers).

In this proceeding, none of the facts relating to the comparability of the PRO Rate benchmark have changed since the time of the *Librarian's PSS Determination*. The two licenses still cover the exact same public performances by the exact same users for the exact same services, and still cover two different (but related and intermingled) copyrighted components of the same sound recordings. The Judges have not identified any new fact or changed circumstance in the record of this proceeding that would change the comparability determination made in the *Librarian's PSS Determination*. Although the Judges make one conclusory statement that they "have more evidence in this proceeding upon which to base a decision," no such evidence is specifically identified in the *Final Determination*. *Final Determination*, 78 FR at 23055.

Music Choice does not dispute that the Judges would be free to reject the PRO Rate benchmark if the record provided a superior marketplace benchmark or other superior methodology for setting the

23

rate. Indeed, this is precisely why, in *Webcasting-I*, the Librarian affirmed the CARP's rejection of the PRO Rate in favor of a marketplace webcasting sound recording performance license negotiated between RIAA and Yahoo!. 67 FR at 45247 (stating that the CARP could have used the PRO Rate as a benchmark), 45253-254 (affirming CARP's selection of a directly comparable marketplace license agreement as the sole benchmark). Similarly, in *Webcasting-II* and *SDARS-I*, the Judges determined that the interactive webcasting benchmark was a better benchmark than the PRO Rate for the licenses at issue in those proceedings. *Webcasting-II*, 72 FR at 24092-95; *SDARS-I*, 73 FR at 4088-93.

In this proceeding, however, there was no marketplace benchmark in the record superior to the PRO Rate. Both Music Choice's and SoundExchange's witnesses agreed that the PSS have numerous unique features that render them non-comparable to any of the direct-licensed digital music services. Del Beccaro WRT at 3-10; Crawford WRT at 9-21; Bryan WDT at 15; Ford WDT at 12-13. The Judges correctly determined, therefore, that the various digital music service agreements submitted by SoundExchange could not be used as reliable

24

benchmarks. *Final Determination*, 78 FR at 23058, 31843. This conclusion was consistent with the Judges' prior ruling, in *SDARS-I*, that the unique features of the PSS and their market rendered the PSS non-comparable to the SDARS for benchmarking purposes. *SDARS-I*, 73 FR at 4089.

Nor does the PSS Settlement Rate provide a usable marketplace benchmark. Indeed, the Judges acknowledged that the PSS Settlement Rate "cannot properly be said to be a market benchmark rate." *Final Determination*, 78 FR at 23058, 31843. Moreover, the PSS Settlement Rate itself was derived from the Librarian's incorrect over-estimate of the PRO Rate, as well as slight incremental increases agreed to by Music Choice solely to avoid litigation expenses while in a position of unequal bargaining power. Especially given that it was essentially derived from an incorrect estimate of the PRO Rate itself, the PSS Settlement Rate can hardly be considered superior to the actual PRO Rate as a benchmark. In any event, as set forth below, pp. 32-37, the record evidence does not support the Judges' use of the PSS Settlement Rate as a benchmark in this proceeding.

With no usable benchmark in the record other than the PRO Rate,

25

the Judges were in the exact same position as the Librarian in PSS-I. Consequently, the Judges' departure from that precedent by rejecting the very benchmark used by the Librarian in that proceeding was erroneous and inconsistent with Section 803(a)(1).[1]

## C.    The Judges Should Have Used the PRO Rate Benchmark to Set the Upper Boundary of Reasonable PSS Rates.

In PSS-I, the Librarian clearly determined that the PRO Rate set the upper bound of the range of potential reasonable rates. *Librarian's PSS Determination*, 63 FR at 25405, 25409-410; *Webcasting-I*, 67 FR at 45247.  In doing so, the Librarian rejected as irrelevant evidence submitted by RIAA establishing that mechanical license rates resulted in substantially more revenue going to record companies than to music publishers from the sales of compact discs and cassettes.

RIAA had argued that this evidence indicated sound recording rights command a higher marketplace value than musical work rights. The Librarian rejected this argument, finding "the mechanical license

---

[1] In the *Final Determination*, the Judges claim that the definitions of "revenues" used to calculate the PRO license royalties were not revealed in the record.  *Final Determination*, 78 FR at 23056, fn. 7.  This claim is incorrect.  Music Choice submitted complete copies of its licenses with the PROs.  Del Beccaro WDT at 21-22 & tabs MC 17-21.

26

and the digital performance license represent different and distinct
rights to the copyright holders under the law" and that because "no
clear nexus exists between the values of [the mechanical right (which
combines the duplication and distribution rights) and the digital
performance right], the model serves no practical purpose in computing
the value of the digital performance right." *Librarian's PSS
Determination*, 63 FR at 25405.

The Librarian also rejected RIAA's argument that this evidence
was indicative of a "marketplace" comparative valuation of the sound
recording and musical composition rights because the argument ignored
"the constraining effect the mechanical license has on the copyright
owners in setting a value on their reproduction and distribution right."
*Id.* As further explained in the *Librarian's PSS Determination*:

> Record companies pay the copyright owners of the
> musical compositions no more than the statutory
> rate for the right to reproduce and distribute the
> musical compositions in a phonorecord. The
> record company then, in turn, sells the
> phonorecord at a fair market price. Because both
> groups do not share equal power to set rates in an
> unfettered marketplace, it is unreasonable to
> compare value of the reproduction and
> distribution right of musical compositions – a rate
> set by the government at a level to achieve

27

> certain statutory goals – with the revenues
> flowing to record companies from a price set in
> the marketplace according to the laws of supply
> and demand, and then to declare that the
> marketplace values the sound recording more
> than the underlying musical composition.

*Id.* Thus, the Librarian found that such revenue splits derived from

mechanical license rates were irrelevant to the question of the relative

value of sound recording and musical composition performance licenses.

*Id.*

In the *Final Determination*, the Judges did not identify any record

evidence supporting their departure from the Librarian's prior

determination that the PRO Rate sets the upper bound for the range of

potential reasonable rates.  To the extent the record differs at all in this

proceeding from the record in PSS-I, the record only further supports

following the Librarian's prior determination.  In addition to the PRO

licenses themselves, Music Choice submitted substantial evidence from

foreign jurisdictions demonstrating that in Canada, the United

Kingdom, and various other European countries, the royalty rates for

non-interactive music service licenses covering the public performance

of sound recordings are typically equivalent to or lower than the

performance licenses for musical compositions.  Del Beccaro WDT at 17-

21 & tabs MC 6-14.  This evidence included several decisions from the UK Copyright Tribunal (which determines license rates pursuant to a willing buyer - willing seller standard) and the Copyright Board of Canada, in which those bodies repeatedly hold, across many different types of non-interactive music services, that the value of the sound recording license is equivalent to the value of the musical composition license.  Indeed, those decisions indicate that the record companies themselves repeatedly acknowledged the equivalent value of the two related rights.  *See also* 8/21/12 Tr. 4304:5-22.

Notably, although it had ample opportunity to do so (and unique access through its member record companies to any existing evidence), SoundExchange did not introduce *any* evidence, testimonial or otherwise, challenging Music Choice's evidence regarding the relative value of sound recording and musical composition performance licenses in foreign jurisdictions.  Nor did the Judges identify any evidence that would contradict or undermine Music Choice's evidence.  Instead, the Judges sweepingly rejected all of the evidence on the grounds that (1) they had previously rejected, in another proceeding, the use of foreign rates as comparable benchmarks; (2) Music Choice did not submit

29

testimony analyzing "the intricacies of Canadian and U.K. markets for performance rights;" and (3) Music Choice "conceded" that the particular license rates in foreign jurisdictions do not necessarily determine what the specific rate should be for rights in the United States. *Final Determination*, 78 FR at 23058.

Each of these criticisms miss the point entirely. Music Choice made clear that it did not offer this evidence for the purpose of using the foreign rates, themselves, as direct benchmarks. Del Beccaro WDT at 21. Instead, this evidence clearly establishes the *relative* value of the two performance rights for various types of music services in each country. Even if there were any "structural or regulatory differences" in these countries that would impact the specific royalty rates set (the rate decisions in evidence do not contain any hint of such differences, nor did SoundExchange or the Judges identify any such differences), such differences would not alter the probative value of the rates on the issue of *relative value within each country*; any such structural or regulatory differences would apply equally to the sound recording and musical publishing rates set within each foreign market. In any event, each of the submitted decisions expressly notes the general principle,

30

unaffected by any particularities specific to the foreign market, that the two licenses fundamentally have equivalent value.  Del Beccaro WDT, Tab MC 6 at 30-33; Tab MC 7 at 14; Tab MC 8 at 50, 58; Tab MC 9 at 4, 6, 15, 17, 30; Tab MC 12 ¶ 53.

**III.**

**THE CRB'S USE OF THE PRIOR PSS RATE AS THE
BENCHMARK TO SET THE PSS RATE WAS ARBITRARY AND
UNSUPPORTED BY RECORD EVIDENCE**

In selecting the PSS Settlement Rate as the starting point for the

new PSS rate in the *Final Determination*, the Judges did not cite any

record evidence that could support a finding that the Rate was

reasonable or otherwise a valid benchmark. Indeed, the Judges

acknowledged that the PSS Settlement Rate was not, itself, a proper

marketplace benchmark. *Final Determination*, 78 FR at 23058. Rather

than cite any evidence affirmatively establishing the PSS Settlement

Rate as reasonable, the Judges instead relied upon an alleged lack of

evidence in the record to the contrary: "nothing in the record persuades

the Judges that [the PSS Settlement Rate] is too high, too low or

otherwise inappropriate." *Id*. Under Section 803(c)(3), the Judges must

affirmatively support their conclusions with specific findings of fact.

This requirement cannot be satisfied by "simple, undifferentiated

allusions to a 10,000-page record." *Christian Broadcasting Network v.

CRT*, 720 F.2d 1295, 1319 (D.C. Cir. 1983). A vague reference to an

alleged lack of evidence to the contrary falls even farther short of

Section 803(c)(3)'s requirement. *IBS v. CRB*, 574 F.3d at 766-67.

32

The only other discussion of the Judges' use of the PSS Settlement Rate as the benchmark for setting the PSS rate is an assertion that the benchmarks submitted by the parties (which the Judges had previously rejected) "perhaps" indicated "the extreme ends of the range of reasonable rates." *Final Determination*, 78 FR at 23058.  The Judges then proceeded to state that unspecified "testimony and argument" indicated that the PRO Rate was some undisclosed amount lower than the lower bound of the range of reasonable rates, and that the 15% rate proposed by SoundExchange for the first year of the rate period sets the upper bound of that range, merely because SoundExchange's expert implicitly "deemed" that rate reasonable as part of SoundExchange's proposal.  *Id*.  The Judges appear to be claiming that because the PSS Settlement Rate lies between the PRO Rate and SoundExchange's 15% first year proposal, it must be reasonable.  The Judges did not, however, cite any record evidence or make any specific factual findings that could possibly establish the high or low end of their posited range of reasonable rates.  Thus, the mere fact that the PSS Settlement Rate lies between the two participants' rate proposals cannot support a conclusion that the Rate is reasonable.  *IBS v. CRB*, 574 F.3d at 766-67

33

(reversing as arbitrary minimum fee set by CRB based solely upon SoundExchange's proposal, without any supporting record evidence).

In simply adopting the PSS Settlement Rate as their benchmark, the Judges did not consider how that Rate was derived or any of the facts in the record concerning the negotiation of that Rate. Music Choice introduced extensive evidence on these issues, none of which was refuted (or even addressed) by SoundExchange in rebuttal. Notably, the PSS Settlement Rate is the product of, and entirely derived from, the 6.5% of gross revenue rate set in PSS-I, which was subsequently carried forward in two settlement agreements with slight rate increases in each settlement. The undisputed record evidence demonstrates (1) that the initial 6.5% rate set in PSS-I was inadvertently set too high as a result of the CARP's and the Librarian's inaccurate estimate of the PRO Rate, which subsequently turned out to be almost double the actual Rate; and (2) each of the subsequent settlements were negotiated in a context of vastly uneven bargaining power and agreed to by Music Choice solely to avoid the tremendously high cost of rate litigation and not based upon any actual valuation of the licensed rights.

34

A.  **The PSS Settlement Rate Was Derived From a Gross Overestimate of the PRO Rate Benchmark in PSS-I**

At the time of the PSS-I proceeding, the PSS only had interim licenses in place with the PROs and therefore the CARP and Librarian had to rely upon estimates of what the final PRO Rate would be. That estimate of the aggregate PRO Rate was 10% of gross revenue. CARP PSS Report at 49-51, ¶¶ 167-169; Del Beccaro WDT at 10.

Once the final PRO licenses were negotiated, the actual PRO Rate was slightly over half the Librarian's 10% estimate. Del Beccaro WDT at 21 & tabs MC 17, 18 and 19. Those actual rates have remained the same since they were negotiated and have been in place for many years now. Del Beccaro WDT at 22 & tabs MC 20-21. Given that the Librarian had used his estimate of the PRO Rate as the upper bound of the range of possible rates, and then set the rate significantly below that upper bound based upon application of the Section 801(b) policy factors, it is clear that the original PSS rate would have been substantially lower if the Librarian had accurately estimated the PRO Rate. Indeed, the resulting rate would likely have been just over half of the 6.5% rate set by the Librarian (and would necessarily have been no higher than the actual PRO Rate).

35

**B.    The Rate Increases Included in the PSS Settlement Rate Were Driven Solely by the Disparate Impact of Rate Litigation Costs on a Small Company Like Music Choice**

Subsequent to PSS-I, Music Choice settled with SoundExchange each time successive rate periods approached.  The undisputed evidence established that Music Choice settled solely to avoid the prohibitive costs associated with the rate-setting litigation process and not because the settlement rates reflected the actual value of the license or any of the Section 801(b) policy factors.  Music Choice's CEO, David Del Beccaro, testified that these litigation costs exerted far more pressure on a single small company like Music Choice than they did upon an industry collective like SoundExchange, which funds its litigation costs out of royalty collections.  Mr. Del Beccaro further testified that at the time each settlement was reached, the slight rate increases demanded by SoundExchange were less costly than the alternative of litigation.  Del Beccaro WDT at 6-9; 6/11/12 Tr. 1478:14-1479:15.  These facts created a massive inequality of bargaining power, and Mr. Del Beccaro testified that SoundExchange expressly used the fact that rate litigation was more burdensome on Music Choice than on SoundExchange to justify its demands for rate increases.  Del Beccaro

36

WDT at 7-8.  Although it had ample opportunity, SoundExchange did not challenge any of this testimony, nor did it present any contrary evidence in the proceeding.

There was not one scintilla of evidence in the record to support the notion that the negotiated rate increases reflected in the PSS Settlement Rate bore any relationship to the actual value of the license, or was otherwise reasonable.  Even if there had been no other usable benchmark (and there was, as demonstrated above), the uncontroverted record evidence established that in order to be used as a benchmark for setting the PSS rate, the PSS Settlement Rate would have had to be adjusted downward significantly to account for both (1) the Librarian's substantial overestimate of the PRO Rate used to set the upper bound of possible rates and (2) the subsequent rate increases extracted by SoundExchange solely through uneven bargaining power due to substantial difference in the parties' respective ability to absorb the high costs of litigating the rate proceedings.

## IV.

## THE CRB'S *SUA SPONTE* IMPOSITION OF A RATE INCREASE BASED SOLELY UPON MUSIC CHOICE'S PLANNED FUTURE CHANNEL EXPANSION, WITHOUT ANY EVIDENCE CONCERNING THE IMPACT, IF ANY, SUCH EXPANSION WOULD HAVE ON SUBSCRIBER LISTENING OR REVENUES, WAS ARBITRARY AND UNSUPPORTED BY RECORD EVIDENCE

The Judges adjusted the PSS Settlement Rate benchmark upwards, from 7.5% to 8.5%, based solely upon Music Choice's future plans to expand the number of channels it offers to subscribers. *Final Determination*, 78 FR at 31845. This Court must vacate the CRB's PSS rate increase because the Judges cited no evidence supporting their determination that an increase in channels would lead to any material increased "use" of music without additional compensation that would justify raising the percentage of revenue paid to copyright owners. Nor was Music Choice given the opportunity to address this question during the proceeding, which would at least have avoided the Judges' need to speculate. Neither SoundExchange nor the Judges raised the possibility during the proceeding that the planned increase in channels might lead to a rate increase. The first hint of such an argument came in the Judges' determination.

Given that neither SoundExchange nor the Judges put forward

38

this novel argument for a rate increase at any time during the proceeding, the Judges' complaint that "Music Choice presented no evidence to suggest that copyright owners would be compensated for the increased usage of their works" rings hollow. A claimed lack of evidence cannot lawfully substitute for actual evidence in support of the increase, especially when Music Choice never had the opportunity to respond to the Judges' argument during the proceeding. *IBS v. CRB*, 574 F.3d at 766-67 (reversing CRB determination premised solely upon lack of evidence to the contrary and noting that participant service could not be faulted for failing to "challenge a theory first presented in the Judges' determination and not advanced by any party.").

## A.   The Judges Acknowledged the Lack of Evidence Supporting Their Assumption That Listening Would Increase, Yet Inexplicably Imposed a Rate Increase Based Upon That Assumption

Although the Judges found that sound recording copyright owners had received a fair return from the PSS Settlement Rate, they noted that Music Choice had indicated plans to increase the number of its channels from 46 to 300 in the first quarter of 2013, and based solely upon that plan, found that the increase in channels alone justified a more than 13% increase in the PSS rate. *Final Determination*, 78 FR at

39

23059-061, 31843-46.  This conclusion was erroneous for several reasons.

As a preliminary matter, the Judges' reliance on Music Choice's future plans to set an immediate rate increase was erroneous.  Notably, at the time Music Choice filed its original written direct testimony, Mr. Del Beccaro testified that Music Choice planned the channel expansion in the first quarter of 2012.  Del Beccaro Uncorrected WDT at 3.  By the time Mr. Del Beccaro filed his amended written direct testimony, this date had already slipped by a year to the first quarter of 2013.  Del Beccaro WDT at 3.  Although the rate increase has already taken effect and it is now the first quarter of 2014, Music Choice has not expanded to 300 channels (and has abandoned its plans to do so in the wake of the financial impact of the rate increase).

More importantly, however, there was no evidence in the record concerning what, if any, impact such a potential future channel expansion would have on listenership.  The Judges acknowledged this lack of evidence, and even the fact that such increases could not be measured or reliably predicted.  *Final Determination*, 78 FR at 31844-45.  Notwithstanding their acknowledgment that "the Judges have no

40

evidence to suggest that the net increase in listenership (or advertising revenue) would be anything more than modest," the Judges simply substituted their own, baseless assumption that such increase would be significant enough to warrant a more than 13% rate increase. *Id.* In fact, there is no reason to assume that merely increasing the number of channels provided to the same number of subscribers will result in any net additional listening (as opposed to listeners merely shifting their listening time among a greater set of channels). Lack of evidence cannot provide the basis for a rate determination. *IBS v. CRB*, 574 F.3d at 766-67.

**B.** **Even If There Had Been Evidence Indicating That a Channel Expansion Would Lead to An Accurately Estimable Future Increase in Listening, Such Increased Listening Could Not Justify the Judges' Rate Increase**

Even if one assumes, despite the lack of evidence, that a potential future increase in the number of channels would result in increased listening, the Judges' imposition of a rate increase would still have been erroneous because the Judges acknowledged that such increased listening would likely lead to an increase in revenues to Music Choice. *Final Determination*, 78 FR at 31844 n.5. Indeed, Music Choice presented undisputed testimony establishing that various

41

improvements to its service over the years have created a net increase in payments to the copyright owners because those improvements have allowed Music Choice to obtain (1) higher rates (and therefore more revenue subject to the license fee) than its competitors and (2) higher rates than it would have received had it not made the various improvements, and specifically anticipated that increasing channels would help slow further reductions in rates (leading to more revenue and royalty payments then it would make in the absence of the channel expansion).  Del Beccaro WDT at 35; 6/11/12 Tr. 1499:1-5, 1509:2-1510:6.

Those increased revenues would, in turn, generate increased royalties because the PSS rate is based upon a percentage of revenue, not the amount of music transmitted.  Thus, there was no evidence that could possibly have supported the need for a rate increase based solely upon the additional channels.

**V.**

**THE CRB'S INTERPRETATION OF THE SECTION 801(B)(1) RATE STANDARD WAS LEGALLY ERRONEOUS AND ITS APPLICATION OF THAT STANDARD WAS ARBITRARY, CONTRARY TO PRECEDENT, AND UNSUPPORTED BY RECORD EVIDENCE**

**A.    The Section 801(b)(1) Policy Standard**

Section 801(b)(1) of the Copyright Act provides that the Judges shall "make determinations and adjustments of reasonable terms and rates of royalty payments" for the compulsory licenses contained in, *inter alia*, Sections 114 and 112(e) of the Copyright Act.  17 U.S.C. § 801(b)(1).  With respect to the compulsory performance license for sound recordings applicable to the PSS, the Act prescribes that such reasonable rates be calculated to achieve the following policy objectives:

> (A)  To maximize the availability of creative works to the public;
>
> (B)  To afford the copyright owner a fair return for his or her creative work and the copyright user a fair income under existing economic conditions;
>
> (C)  To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expressions and media for their

43

communication; and

(D)  To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.

17 U.S.C. 801(b)(1).

In PSS-I, the Librarian specifically ruled that in the context of the PSS, these objectives must be construed in light of the legislative purpose of the PSS license, which requires the setting of a rate that "affords the copyright owners some control over the distribution of their creative works through digital transmissions, then balances the owners' right to compensation against the users' need for access to the works at a price that would not hamper their growth."  *Librarian's PSS Determination*, 63 FR at 25409.  *See also id.* at 25408 (citing DPRA Senate Report at 15-16).

## B.   <u>The CRB's Interpretation of the First Section 801(b)(1) Objective Was Legally Erroneous</u>

The Judges determined that the PSS Settlement Rate sufficiently maximized the availability of creative works because (1) there was no evidence in the record that a higher rate would lead to the creation of any more sound recordings and (2) Music Choice had not "reduced its music offerings or contemplated exiting the business" under the existing

44

rate and there was no evidence "that a lower rate would necessarily further stimulate Music Choice's current and planned offerings." *Final Determination*, 78 FR at 23059, 31844.  The first point is certainly true. In fact, the record contained affirmative evidence that the total payments to the record companies from the PSS license, even with a substantial rate increase, is insignificant to the record companies from an accounting and business perspective, and would not be considered in planning the number of recordings to release in a given year.  Crawford WRT at 36-37; 6/14/12 Tr. 2152:10-2153:2; 6/13/12 Tr. 2043:17-2044:20. The second point, however, is based upon an erroneous interpretation of the first policy factor.

In making their determination with respect to the first policy factor, the Judges have interpreted that objective as being satisfied by any rate that does not cause the PSS to decrease their product offerings or contemplate exiting the business.  Such a rule effectively penalizes Music Choice for making strategic investments necessary to stay in business, rendering the Judges' interpretation of the first policy factor erroneous.  It is also directly contrary to the statutory purpose of the PSS license, which sought to ensure "emergence of new technologies

45

would not be hampered." *Librarian's Determination*, 63 FR at 25399,

*citing* DPRA Senate Report at 15.

## C.   The CRB's Interpretation of the Second Section 801(b)(1) Objective Was Legally Erroneous and Its Application of That Factor Was Unsupported by Record Evidence

Music Choice presented substantial evidence demonstrating that

its residential music service, the only component of its business subject

to the Section 114 license, has at best returned a modest profit in some

years (although far less than expected industry average returns),

generated losses in many others, and cumulatively has not come close to

making any return on invested capital. *Final Determination*, 78 FR at

23059, 31844.  The Judges sweepingly rejected all of this evidence, on

the ground that the evidence allegedly aggregated Music Choice's

residential audio service with Music Choice's separate commercial

music service business.  *Id*.  This claim is false and contradicted by the

record.  All of the financial evidence submitted by Music Choice clearly

indicated that the reports of Music Choice's financial performance

specifically excluded revenues and costs from its separate commercial

service.  Del Beccaro WRT, tabs 69-71 (Note 1 to each chart expressly

states that financial data excludes revenues and costs from, *inter alia*,

46

Music Choice's commercial service business line); 6/11/12 Tr. 1495:19-1496:16; 8/16/12 Tr. 3859:21-3862:1.

After inaccurately faulting Music Choice for submitting financial reports that included the commercial business, the Judges next used Music Choice's consolidated financial statements (which *do* include results for Music Choice's more profitable commercial service) as the basis for finding that the results of Music Choice's *consolidated* business indicate that it has been sufficiently profitable. *Final Determination*, 78 FR 23059, 31844. It was error for the Judges to use the financial performance of Music Choice's consolidated operations, which specifically included revenues from its wholly separate commercial music service line of business (for which sound recording copyright owners are paid a higher rate pursuant to a totally different statutory license), to gauge whether Music Choice's residential music service has generated a fair income, particularly while ignoring the probative evidence submitted by Music Choice of the actual performance of its residential music service business line.

**D.**    **The CRB's Interpretation of the Third Section 801(b)(1) Objective Was Legally Erroneous**

With respect to the third factor, the Judges flipped precedent on its head.  First, the Judges acknowledged that Music Choice submitted evidence of substantial creative contributions, technological contributions, capital investments, costs and risks, and opening new markets for creative expression and media for communication (and also correctly noted that SoundExchange submitted no evidence whatsoever on these issues).  *Final Determination*, 78 FR at 23060, 31845.  In PSS-I, the Librarian determined that similar evidence (but demonstrating substantially lower contributions at that time) warranted reducing the rate from the PRO Rate benchmark.  *Librarian's PSS Determination*, 63 FR at 25407-408, 25410.  Given a similar, yet stronger, factual record in this proceeding, the Judges reached the opposite conclusion, concluding that Music Choice's strong (and wholly unrebutted) showing did not justify any decrease from the benchmark rate.  *Final Determination*, 78 FR at 23060, 31845.  This analysis and conclusion are not only inconsistent with the Librarian's prior determination, but also his prior interpretation of the third statutory policy factor, which expressly requires balancing of the copyright owners' and users' relative roles and

48

contributions in several areas, in contravention of Section 803(a)(1).

**E.** **The CRB's Interpretation of the Fourth Section 801(b)(1) Objective Was Legally Erroneous and Its Application of That Factor Was Unsupported by Record Evidence**

    1.    The Judges Erroneously Interpreted the Fourth Objective, Minimizing Any Disruptive Impact On the Industries Involved, as Being Satisfied by Any Rate That Does Not Directly Produce an Adverse Impact That Is Substantial, Immediate, and Irreversible in the Short Run

The Judges have adopted a test for the fourth policy factor that requires a showing that a benchmark rate "directly produces an adverse impact that is substantial, immediate, and irreversible in the short-run" in order to justify a downward adjustment. *Final Determination*, 78 FR at 23061, 31846. This test is inconsistent with the applicable precedent, and contravenes Section 803(a)(1). In PSS-I, the Librarian interpreted this factor, particularly in the context of the PSS, in a far more flexible manner. The Librarian focused on the three PSS' long term, not merely their imminent or short term, survival, and also took note that it was proper to consider the history and context of the PSS under the market disruption factor, including legislative intent when the sound recording performance right (and the Section 114 compulsory license as a limit on that right) were first created. *Librarian's PSS Determination*, 63 FR at

49

25408.

It is important to note that, unlike any other Section 114 licensees (including the SDARS), the PSS had already launched their services and had been digitally transmitting sound recording performances for several years before the sound recording performance right even existed. Thus, at the time they launched their services, the PSS had no expectation that they would be required to pay any royalties for sound recording rights. Del Beccaro WDT at 5. In the legislative history cited by the Librarian, Congress indicated that while creating an entirely new revenue stream for sound recording copyright owners (who enjoyed no performance right whatsoever prior to 1995), one reason it simultaneously created the Section 114 statutory license with rates to be set under the Section 801(b) standard was to ensure that it would remain economically feasible for the existing music services (later to be called the PSS) to continue their current uses of sound recordings. DPRA Senate Report at 16; DPRA House Report at 14. These very concerns, the fostering of new technologies and protection of the pioneering companies that take the risks of creating new markets, were relied upon by the Librarian in the *Librarian's PSS Determination*.

50

These same concerns, of protecting the legitimate business expectancies of the PSS, were expressed again in the legislative history of the DMCA.  While adopting a new, willing buyer – willing seller royalty rate standard for future entrants into the non-interactive digital music service market, Congress grandfathered the PSS under the Section 801(b) policy based standard.  In the legislative history, Congress again noted its intent to "prevent disruption of the existing operations by such services."  DMCA Conference Report at 81.  In connection with the most recent prior PSS rate proceeding, the Register affirmed this legislative intent to protect the PSS' unique business expectancies with respect to royalty rates, in light of their investments and risks in creating the first digital music services under a different legal regime.  *Register's PSS Opinion*, 71 FR at 64645.

The Judges' rigid test for the market disruption factor also is inconsistent with the Librarian's interpretation of that factor in the *Librarian's PSS Determination*.  The Librarian expressly noted that the risk of a high rate preventing the PSS from generating a long-term profit drove his determination that the fourth factor weighed in favor of setting a rate lower than the PRO Rate benchmark.  *Librarian's PSS*

51

*Determination*, 63 FR at 25408-409.  Rather than simply evaluate whether the PSS are likely to be immediately destroyed by a new rate, the Judges are required to weigh the impact of the rate on both industries and adjust the rate accordingly within the bounds of the reasonable range.  *Librarian's PSS Determination*, 63 FR at 25394-01,

The Judges' ruling that the mere fact of Music Choice's continued operation indicates a lack of market disruption (even though it has still not recovered its cumulative capital investments, DMX dissolved in bankruptcy, and Muzak long ago ceased even attempting to expand its residential music business beyond one affiliate) is similarly inconsistent with that precedent.

> 2.    The Judges' Finding That the PSS Settlement Rate Would Not Cause Any Disruption to the PSS Was Unsupported by Record Evidence

In support of its contention that the PSS Settlement Rate was itself disruptive even without the Judges' upward adjustment, Music Choice presented a wealth of data regarding its financial performance, which showed that under the current rate, Music Choice has incurred substantial cumulative losses, which are expected to continue over the next license period.  Del Beccaro WDT at 33-34; Del Becarro WRT, Tabs

52

MC 69 at 1, MC 70 at 1.

Moreover, the entire PSS market must be considered in connection with the fourth factor.  Music Choice presented unrefuted evidence that since the PSS-I proceeding, two of the three PSS were effectively driven from the market, in large part due to the excessive royalty rate set in that early proceeding.  DMX entered bankruptcy and sold its assets in 2000.  6/11/12 Tr. 1469:14-20; Del Beccaro WDT at 44.  Muzak limits its participation in the PSS market to only one affiliate, in favor of focusing on its profitable commercial background music business.  6/11/12 Tr. 1469:21-1470:6.

The Judges cited nothing to contradict the weight of that evidence.  Rather than follow precedent, the Judges merely found that because one PSS, Music Choice, continues to operate and improve its service, the existing rate cannot be disruptive.  *Final Determination*, 78 FR at 23061, 31846.   Such a finding is unsupported by the record and therefore cannot support the *Final Determination*.

## **CONCLUSION**

For the foregoing reasons, Music Choice respectfully requests that the Court vacate the *Final Determination* and remand the matter for further consideration and with specific instructions that the Judges must utilize the PRO Rate to set the upper bound of reasonable rates for the PSS license and properly analyze the Section 801(b) policy objectives to select a rate no higher than the PRO Rate.

In the alternative, to the extent the Court holds that the Judges did not err in using the PSS Settlement benchmark to set the PSS rate, Music Choice respectfully requests that the Court vacate the *Final Determination* and remand the matter with specific instructions to eliminate the rate increase improperly imposed by the Judges based upon Music Choice's then-planned channel expansion and reduce the PSS Settlement benchmark to account for (1) the Librarian's substantial overestimate of the PRO Rate used to set the original rate in PSS-I and (2) the subsequent rate increases extracted by SoundExchange solely through uneven bargaining power.

54

Dated:  January 14, 2014          Respectfully submitted,

    /s/ Paul M. Fakler
Paul M. Fakler
ARENT FOX LLP
1675 Broadway
New York, NY 10019-5874
Tel: 212.484.3900
Fax: 212.484.3990
paul.fakler@arentfox.com

Martin F. Cunniff
ARENT FOX LLP
1717 K Street, N.W.
Washington, D.C.  20036
Tel: 202.857.6000
Fax: 202.857.6395
martin.cunniff@arentfox.com

*Attorneys for Appellant Music Choice*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation as set forth in Fed. R. App. P. 28.1(e)(2)(A) because this brief contains 9,880 words, which is within the 10,000 words permitted by the Court's order.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), as modified by D.C. Cir. R. 32(A)(1), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word with 14-point Century Schoolbook font.

January 14, 2014

/s/ Paul M. Fakler
Paul M. Fakler

56

## Certificate of Service

I, Paul M. Fakler, certify that on this 14th day of January, 2014, I served the foregoing Music Choice's Opening Brief for Appellant by filing it with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/EMF system and that counsel designated below are registered CM/EMF users.  I further certify that I have caused copies of the foregoing Music Choice's Opening Brief for Appellant to be sent to the counsel designated below by email and first-class mail.

| | |
|---|---|
| R. Bruce Rich<br>Bruce S. Meyer<br>Todd D. Larson<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Fax: (212) 310-8007<br>r.bruce.rich@weil.com<br>bruce.meyer@weil.com<br>todd.larson@weil.com<br><br>Counsel for Sirius XM Radio, Inc. | David A. Handzo<br>Michael B. DeSanctis<br>Jared O. Freedman<br>JENNER & BLOCK LLP<br>1099 New York Ave., N.W.<br>Washington, D.C. 20001<br>dhandzo@jenner.com<br>mdesanctis@jenner.com<br>jfreedman@jenner.com<br><br>Counsel for SoundExchange, Inc. |
| Mark R. Freeman<br>Scott R. McIntosh<br>Civil Division, Appellate Staff<br>U.S. Department of Justice<br>950 Pennsylvania Ave. N.W., Room 7228<br>Washington, D.C. 20530<br>mark.freeman2@usdoj.gov<br>scott.mcintosh@usdoj.gov | |

/s/ Paul M. Fakler
Paul M. Fakler

1